UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



FILED

MAR 08 2011

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: MARLENE A. PENROD,<br><br>Debtor,<br><br>——————————————<br><br>AMERICREDIT FINANCIAL SERVICES, INC.,<br><br>Appellant,<br><br>v.<br><br>MARLENE A. PENROD,<br><br>Appellee. | No. 08-60037<br><br>BAP Nos. 07-1360,<br>07-1368<br>BAP, 9th Circuit<br><br>**MANDATE** |

RECEIVED
Susan M. Sprau, Clerk
U.S. BKCY APP PANEL
OF THE NINTH CIRCUIT

MAR 0 8 2011

FILED _____

DOCKETED _____
            DATE       INITIAL

The judgment of this Court, entered July 16, 2010, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule 41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

Molly C. Dwyer
Clerk of Court

Synitha Walker
Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In re: MARLENE A. PENROD,
    *Debtor.*

AMERICREDIT FINANCIAL SERVICES, INC.,
    *Creditor-Appellant,*

v.

MARLENE A. PENROD,
    *Debtor-Appellee.*

No. 08-60037
BAP Nos.
07-1360,
07-1368

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Markell, Klein, and Jury, Bankruptcy Judges

Argued and Submitted
November 5, 2009—San Francisco, California

Filed July 16, 2010

Before: Alfred T. Goodwin and William A. Fletcher,
Circuit Judges, and Richard Mills, District Judge.*

Opinion by Judge Richard Mills

---

*The Honorable Richard Mills, Senior United States District Judge for the Central District of Illinois, sitting by designation.

10313

## COUNSEL

William M. Burke, Costa Mesa, California, and Randall P. Mroczynski, Cooksey Toolen Gage Duffy & Woog, Costa Mesa, California, for the creditor-appellant.

Kenneth N. Klee, Klee, Tuchin, Bogdanoff & Stern LLP, Los Angeles, California, and Craig V. Winslow, San Mateo, California, for the debtor-appellee.

Jan T. Chilton, Severson & Werson, San Francisco, California, and James J. White, Ann Arbor, Michigan, for amici curiae American Financial Services Association, National Automobile Dealers Association, and California Bankers Association.

Barkley Clark and Katherine M. Sutcliffe Becker, Stinson Morrison Hecker LLP, Washington, D.C., for amici curiae GMAC LLC, Ford Motor Credit Company LLC, Wells Fargo Bank, N.A., Bank of America, N.A., America Honda Finance Corp., and Toyota Motor Credit Corp.

M. Jonathan Hayes, Northridge, California, for amici curiae Professors Ingrid M. Hillinger, Michael Hillinger, Adam J. Levitin, and Jean Braucher.

## OPINION

MILLS, District Judge:

The question presented in this case is whether a creditor has a purchase money security interest in the "negative equity" of a vehicle traded in at the time of a new vehicle purchase.

IN RE PENROD                                10317

Because we answer this question in the negative, we affirm the decision of the Bankruptcy Appellate Panel ("BAP").

## I. BACKGROUND

In September 2005, Marlene Penrod purchased a 2005 Ford Taurus from a California Ford dealership. According to the figures recited by the BAP,[1] the price of the car, including tax and license, was approximately $25,600. Penrod traded in her 1999 Ford Explorer and paid approximately $1,000 down for her new vehicle. She owed over $13,000 on the Explorer and she received $6,000 in credit for the vehicle. Therefore, there was over $7,000 in "negative equity" on the trade-in vehicle.

The dealership paid off the remaining balance on the Explorer and added the negative equity to the amount financed. Penrod financed approximately $31,700 in order to purchase a vehicle that cost approximately $25,600. According to the contract, Penrod was to pay twenty percent interest on the loan. The dealership subsequently assigned the contract to AmeriCredit Financial Services.

523 days after purchasing the Ford Taurus, Penrod filed for bankruptcy protection under Chapter 13. She still owed $25,675 to AmeriCredit, which included the negative equity from the Ford Explorer. In her Chapter 13 plan, Penrod proposed to bifurcate AmeriCredit's claim into secured and unsecured portions. AmeriCredit objected to the plan, claiming it had a purchase money security interest in the entire amount, including the negative equity.

---

[1]The Appellant has challenged the BAP's calculations. In particular, the Appellant claims that down payments and manufacturer rebates should have been deducted from the gross negative equity amount, in accordance with Cal. Civ. Code § 2982(a)(6)(G). We express no opinion on the merits of the Appellant's argument. Rather, we remand to the bankruptcy court to examine the Appellant's arguments and determine how credit should be given for the rebate and the down payment.

The bankruptcy court held that AmeriCredit did not have a purchase money security interest in the portion of the loan related to the negative equity charges. However, the bankruptcy court acknowledged that AmeriCredit had a purchase money security interest in the remaining balance. In doing so, the bankruptcy court adopted the dual status rule, which allows part of a loan to have non-purchase money status, while the remainder is covered by a purchase money security interest.[2]

The bankruptcy court decision was affirmed by the BAP in a published opinion. AmeriCredit challenges the BAP's ruling in this appeal.

## II. STANDARD OF REVIEW

"We review decisions of the BAP de novo and apply the same standard of review that the BAP applied to the bankruptcy court's ruling. . . . We also review de novo the bankruptcy court's and the BAP's interpretations of the bankruptcy statute." *Boyajian v. New Falls Corp. (In re Boyajian)*, 564 F.3d 1088, 1090 (9th Cir. 2009) (citations omitted).

## III. DISCUSSION

### A.

AmeriCredit has placed great emphasis on the decisions of the other circuit courts of appeal. In total, over some strong dissents, eight circuits have held that a creditor has a purchase money security interest in the negative equity of a debtor's

---

[2] We note that the Parties have not challenged the BAP's decision regarding the application of the dual status rule. Therefore, we will not address whether the dual status rule or the transformation rule should apply, although we recognize that the BAP's use of the dual status rule has been criticized by some. *See* Geoffrey M. Collins, Note, *Negative Equity and Purchase-Money Security Interests Under the Uniform Commercial Code and the BAPCPA*, 95 Cornell L. Rev. 161, 182-84 (2009).

trade-in vehicle. *Nuvell Credit Corp. v. Westfall (In re Westfall)*, 599 F.3d 498 (6th Cir. 2010); *In re Howard*, 597 F.3d 852 (7th Cir. 2010); *Reiber v. GMAC, LLC (In re Peaslee)*, 585 F.3d 53 (2d Cir. 2009) (per curiam) (adopting the response to a certified question of a divided New York Court of Appeals, *In re Peaslee*, 13 N.Y.3d 75 (2009)); *Ford Motor Credit Co. v. Dale (In re Dale)*, 582 F.3d 568 (5th Cir. 2009); *Ford Motor Credit Co. v. Mierkowski (In re Mierkowski)*, 580 F.3d 740 (8th Cir. 2009); *Ford v. Ford Motor Credit Co. (In re Ford)*, 574 F.3d 1279 (10th Cir. 2009); *In re Price*, 562 F.3d 618 (4th Cir. 2009); and *Graupner v. Nuvell Credit Corp. (In re Graupner)*, 537 F.3d 1295 (11th Cir. 2008).

We decline to adopt the reasoning of our sister circuits. We acknowledge that our decision creates a circuit split, and we do not do this lightly. However, we are persuaded by the well-reasoned decision of Bankruptcy Judge Markell and his colleagues on the BAP.

This appeal involves the application of 11 U.S.C. § 1325(a)(*) — a paragraph added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). The paragraph is commonly called the "hanging paragraph" because it was added to the end of § 1325(a) without a number.

[1] The hanging paragraph prevents the bifurcation of certain claims. Bifurcation occurs when a creditor's claim is split into secured and unsecured claims. The hanging paragraph states:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as

defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

11 U.S.C. § 1325(a)(*).

[2] The only requirement from the hanging paragraph that is at issue in this case is whether there was a purchase money security interest in the negative equity in the trade-in vehicle.

[3] The term "purchase money security interest" is not defined in the bankruptcy code. In bankruptcy, property interests are usually defined by state law. *See Butner v. United States*, 440 U.S. 48, 54-57 (1979). California has adopted the relevant portion of Revised Article 9 of the Uniform Commercial Code ("U.C.C.") and the U.C.C. Official Comment. Purchase money security interest is defined in U.C.C. § 9-103, and in California Commercial Code § 9103.

The code does not provide a precise, encapsulated definition of purchase money security interest, but rather a string of connected definitions. The relevant language provides that "[a] security interest in goods is a purchase money security interest . . . [t]o the extent that the goods are purchase money collateral with respect to that security interest." Cal. Comm. Code § 9103(b). " 'Purchase money collateral' means goods or software that secures a purchase money obligation." Cal. Comm. Code § 9103(a)(1). " 'Purchase money obligation' means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." Cal. Comm. Code § 9103(a)(2).

[4] In plain English, a purchase money security interest arises when a person buys a good and the seller (if a dealer financed transaction) or lender (if the sale is financed by a

loan) retains a security interest in that good for all or part of the price. Purchase money security interests have long been favored at law, and enjoy "super-priority" rights over other types of security interests and liens. *See* Grant Gilmore, *The Purchase Money Priority*, 76 Harv. L. Rev. 1333 (1963).

### B.

[5] With all of the foregoing as background, we arrive at the key issue of this appeal — the meaning of "price" for the purposes of the purchase money security interest. The definition is found in the Official Comment.

> As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

U.C.C. § 9-103 cmt. 3.

AmeriCredit argues that the negative equity related to the Ford Taurus Penrod traded in is an "expense[ ] incurred in connection with acquiring rights in the collateral." In doing so, AmeriCredit places more weight on this phrase than it can bear.

[6] The payment of Penrod's remaining debt on her 1999 Ford Explorer cannot easily be characterized as an "expense." It is the payment of an antecedent debt, not an expense incurred in buying the new vehicle. *See In re Peaslee*, 13 N.Y.3d at 83 (Smith, J., dissenting) ("A refinanced loan is not, in accounting terms, properly speaking an 'expense' at all; it is the substitution of a new liability for an old one.").

AmeriCredit claims that the transactions are closely connected, and that the requirements of Comment 3 are satisfied as a result. While all things are connected at some level, the question here is whether the negative equity on Penrod's Ford Explorer was sufficiently connected to the purchase of the Ford Taurus to establish a purchase-money security interest. We hold that it is not.

AmeriCredit and some courts have looked to studies indicating that over a third of vehicle purchases in the United States involve negative equity to conclude that they are sufficiently connected. *See, e.g., In re Howard*, 597 F.3d at 857-58. Some circuits have described combining a new vehicle purchase with negative equity as a "package deal." *See In re Graupner*, 537 F.3d at 1302. While the trade-in and new purchase may be performed at the same time, or use one unified document, this does not automatically mean that there is a purchase money security interest. Judge Bye, of the Eighth Circuit, aptly made this point:

> The fact that financing negative equity has become a customary industry practice, and practical reality necessary to many motor vehicle sales transactions, does not alter the fact that negative equity does not fall within Article 9's definition of "price" or "value given." Money or value given to pay off the negative equity in a trade-in vehicle is not, in the strictest sense, given to acquire rights in the secured collateral. Neither does the negative equity represent any part of the price of the vehicle or associated costs arising directly from the sale. The realities of such transactions frequently require the financing of negative equity to facilitate the sale, but the focus should be on price or value given as defined by Article 9, and not what is necessary to entice sellers and lenders into the transaction.

*In re Mierkowski*, 580 F.3d at 746 (Bye, J., dissenting).

Finally, negative equity cannot fall under the "other similar obligations" category because negative equity is unlike the examples listed in Comment 3. The items in the list are transaction costs related to purchase, and negative equity will "typically be larger, and more readily separable from the purchase transaction itself, than such things as sales tax, duties and finance charges." *In re Peaslee*, 13 N.Y.3d at 83-84 (Smith, J., dissenting); *see also In re Ford*, 574 F.3d at 1289 (Tymkovitch, J., dissenting).

[7] However one structures or describes the transaction, the negative equity is antecedent debt. A seller or lender can obtain a purchase money security interest only for new value, and closely related costs. Old value simply does not fit within that rubric.

### C.

[8] AmeriCredit argues that the California Automobile Sales Finance Act ("ASFA") should be used in determining the "price of the collateral." The ASFA inlcudes negative equity charges in the "cash price" of the vehicle. Cal. Civ. Code § 2981(e). AmeriCredit has invoked the in pari materia doctrine to read the ASFA and Article 9 together, to construe the term "price of the collateral."

[9] We disagree. The purpose of the "cash price" definition in the ASFA is to disclose to consumers that they are responsible for negative equity charges. The definition says nothing about whether those charges result in a purchase money security interest. *See In re Ford*, 574 F.3d 1292-93 (Tymkovitch, J., dissenting). The disclosure provisions of the ASFA were enacted for a different purpose than the "price of the collateral" provision in the U.C.C. Even courts that have ruled in favor of creditors have recognized that laws such as the ASFA are not helpful in determining the "price of the collateral." Writing for the Seventh Circuit, Judge Posner said the following regarding an analogous Illinois law: "[i]t's a

| 10324 | IN RE PENROD |
|---|---|

consumer-protection statute, intended to require disclosure of the charges that make up the total price that a consumer pays for the car, rather than to prescribe what is and is not included in the purchase money security interest." *In re Howard*, 597 F.3d at 857. Therefore, we ignore the ASFA's "cash price" definition.

### D.

AmeriCredit has argued that its position is in harmony with federal bankruptcy law. In its brief, AmeriCredit states that "Section 547(c)(3) of the Bankruptcy Code gives special protection from preference avoidance to 'enabling loans,' which are defined like a purchase-money security interest." However, upon closer examination it appears that AmeriCredit's position runs counter to basic federal bankruptcy principles. Specifically, the statutory language cited by AmeriCredit provides that:

> (c) The trustee may not avoid under this section a transfer—
>
> . . .
>
> > (3) that creates a security interest in property acquired by the debtor—
> >
> > > (A) to the extent that such security interest secures new value that was—
> > >
> > > > (i) given at or after the security agreement that contains a description of such property as collateral;
> > > >
> > > > (ii) given by or on behalf of the secured party under such agreement;
> > > >
> > > > (iii) given to enable the debtor to acquire such property; and

IN RE PENROD 10325

> (iv) in fact used by the debtor to acquire such property; and
>
> (B) that is perfected on or before 30 days after the debtor receives possession of such property[.]

11 U.S.C. § 547(c)(3).

[10] However, new value is defined in the same section as follows:

> "[N]ew value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, *but does not include an obligation substituted for an existing obligation*[.]

11 U.S.C. § 547(a)(2) (emphasis added).

[11] Therefore, AmeriCredit's position is not consistent with the Bankruptcy Code. Under the Bankruptcy Code, security interests are given preferential treatment to the extent that the obligation relates to the receipt of truly new value, not just old obligations that have been repackaged. The negative equity charges related to Penrod's 1999 Ford Explorer would not qualify as new value under 11 U.S.C. § 547(a)(2). Therefore, AmeriCredit's position is not in harmony with federal bankruptcy principles.

E.

Any conclusion in favor of AmeriCredit based upon the phrase "value given to enable the debtor to acquire rights in or the use of collateral" would be erroneous. Many of the

| 10326 | In re Penrod |
|---|---|

courts that have faced this issue have honed in on the "value given to enable" language in describing negative equity. Those courts see "value given to enable" as a good descriptor of how the original car and its loan might be an obstacle to purchasing the new car.

However, there is a difference between "price" and "value given to enable."[3] Both sellers and third party lenders can obtain purchase money security interests. A seller obtains a purchase money security interest through a dealer financed sale, where the merchandise goes out the door upon the credit of the buyer. Payment is to be made to the dealer. A purchase money security interest is only valid for the "price" of the merchandise.

A lender such as a finance company, bank, or credit union obtains a purchase money security interest when it makes funds available to the purchaser to buy the merchandise. The money is provided to the borrower to make the purchase. *See* Collins, 95 Cornell L. Rev. at 186. That language is somewhat broader than "price" because the money has to be traced from the lender to the borrower to the seller. *See In re Howard*, 597 F.3d at 855-56 ("The 'value given' part of the definition is intended to make clear that the obligation can be to a finance company . . . rather than to the seller."). Broad language is employed to encompass third party financing, not to expand the scope of purchase money security interests.

[12] In sum, we find that a creditor does not have a purchase money security interest in the "negative equity" of a vehicle traded in during a new vehicle purchase.

---

[3]We note that AmeriCredit claims that there is a purchase money security interest in the negative equity under "price." This is correct, because the sale was initially financed by the dealer, and the indebtedness was subsequently transferred to AmeriCredit. As a dealer-financed transaction, "price" should be used instead of "value given to enable."

## IV. CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Appellate Panel is **AFFIRMED** and **REMANDED** to the bankruptcy court for further proceedings regarding how credit should be given for the rebate and down payment.

# U.S. Bankruptcy Appellate Panel
# of the Ninth Circuit

125 South Grand Avenue, Pasadena, California 91105
Appeals from Central California (626) 229-7220
Appeals from all other Districts (626) 229-7225

**TO:** Clerk, Bankruptcy Court, San Francisco District of Northern Califorma

**RE:** MARLENE A. PENROD

**CA No.:** 08-60037

**BAP No.:** NC-07-1360-MkKJu and NC-07-1368-MkKJu

**Bkcy Court No.:** 07-30252

**Adv No.:**


The judgment of this Panel entered on 07/28/2008 was appealed to the United States Court of Appeals for the Ninth Circuit.

Attached is a copy of the mandate of the Court of Appeals received on 03/08/2011.

The Court of Appeals AFFIRMED and REMANDED the BAP decision.


Susan M Spraul, BAP Clerk

By: Patti Ippolito, Deputy Clerk
Date: May 3, 2011